UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| JOHN BITZER, <br><br> Plaintiff, <br><br> v. <br><br> COMMISSIONER INDIANA DEPT OF CORRECTION, et al., <br><br> Defendants. | CASE NO. 3:20-CV-342-JD-MGG |

**REPORT AND RECOMMENDATION**

John Bitzer, an individual formerly incarcerated at the Miami Correctional Facility ("MCF") in Bunker Hill, Indiana, proceeds on Eighth Amendment claims for failure to protect and supervisory liability arising from sexual assaults by his cellmate followed by threats and assaults by members of the cellmate's gang between November 2019 and April 2020. On July 30, 2020, while Plaintiff was still representing himself, Defendants filed a motion for summary judgment based on their affirmative defense of failure to exhaust administrative remedies. [DE 26]. Starting in October 2020, counsel entered their appearances on behalf of Plaintiff, which led to the filing of two amended complaints. In March 2021, Defendants' summary judgment motion was denied as moot after the first amended complaint was filed. [DE 60]. The Court then narrowed the scope of Plaintiff's claims in February and March 2022 in its orders resolving motions to dismiss Plaintiff's second amended complaint. [DE 93, 95].

By March 14, 2022, Defendants had not renewed their exhaustion-based motion for summary judgment, so Bitzer filed a motion for an evidentiary hearing pursuant to *Pavey v. Conley*, 5544 F.3d 739 (7th Cir. 2008) seeking a determination as to whether he exhausted his administrative remedies before filing this lawsuit. [DE 94]. The Court concluded that a factual dispute exists regarding whether the administrative process was available to Bitzer and whether he utilized that process. [DE 97]. This case was then referred to the undersigned "to prepare a report and recommendation and if necessary to hold an evidentiary hearing pursuant to *Pavey*." [*Id.*]. An evidentiary hearing was held by video teleconference on August 17, 2022. [DE 112, 113]. At the end of the hearing, Bitzer moved for judgment as a matter of law under Fed. R. Civ. P. 50(a). The Rule 50 motion was taken under advisement after which the parties timely filed post-hearing briefs that have now been considered along with the evidence presented by the parties at the hearing[1].

## I. RELEVANT BACKGROUND

Defendants submitted the Offender Grievance Process, 00-02-301 ("the grievance policy") for inmates housed in correctional facilities maintained by the Indiana Department of Correction ("IDOC"). [DE 26-2[2]]. According to the policy, certain matters are deemed non-grievable issues making them inappropriate for consideration under

---

[1] Bitzer also submitted Notice of Supplemental Authority on March 9, 2023, citing *Smallwood v. Williams*, 59 F.4th 306 (7th Cir. 2023), which the Court has reviewed.

[2] The grievance policy was admitted at the hearing as Defendant's Exhibit 1, but none of the hearing exhibits were filed on the docket. Instead, printed copies of the exhibits have been maintained by the Court. Defendants attached the identical version of the grievance policy to their motion for summary judgment on July 30, 2020, at Docket Entry 26-2. The Court will also reference other exhibits in this Report and Recommendation by docket entry number when identical versions were included in the record for other purposes.

the policy. [*Id*. at 3–4, § IV.B]. The list of non-grievable issues includes "Tort Claims seeking monetary compensation." [*Id*. at 4, § IV.B.12].

Inmates utilizing the grievance policy must attempt to informally resolve concerns arising from grievable issues and provide evidence of the attempt before submitting a formal grievance. [*Id*. at 8, § X]. If the inmate is dissatisfied with the response to the informal attempt, he may submit a formal grievance to the facility's Offender Grievance Specialist within ten days of the incident. [*Id*. at 9, § XI]. If the inmate does not receive a receipt for an accepted grievance form, or a rejected form from the grievance specialist, within five days of submitting it, he must notify the grievance specialist and retain a copy of the notice. [*Id*.]

The grievance specialist must provide the inmate with a response to the grievance within fifteen days of the receipt of the grievance. [*Id*. at 10, § XI.C]. If the inmate is dissatisfied with the response to the formal grievance, he may appeal to the Warden or his designee by completing the appropriate sections of the response form and submitting it to the grievance specialist within five days of receipt of the response. [*Id*. at 11–12, § XII]. If the inmate receives no response to his grievance within twenty days "of being investigated by the [grievance specialist, he] may appeal as though the grievance had been denied." [*Id*. at 11].

Pursuant to the grievance policy, the Warden, or his designee, must complete a response to an appeal within five days of receipt of the appeal. [*Id*.]. If the inmate is dissatisfied with the appeal response, or if he receives no response to his appeal, he may direct a secondary appeal to the IDOC Offender Grievance Manager by completing the

3

appropriate sections of the appeal response form and submitting it to the grievance specialist within five days of receipt of the Warden's appeal response. [*Id.* at 12, §§ XII, XIII]. The grievance manager submits a response to the appeal to the grievance specialist within ten days of receiving the appeal. [*Id.* at 13, § XIII]. The grievance specialist then delivers the response to the inmate within two days of receipt. [*Id.*].

Yet, when sexual abuse of an inmate is alleged, the grievance policy provides for expedited processing of grievances under the Prison Rape Elimination Act ("PREA"), including elimination of the informal grievance process. [*Id.* at 4–6, § IV.D]. Time limits for PREA grievances are also removed and inmates may consider a lack of response to a PREA grievance as a denial at that level. [*Id.* at 5]. Furthermore, to promote the protective policy underlying the Act, third parties, such as other offenders, may submit PREA grievances on behalf of an inmate. [*Id.* at 6].

At the hearing, Angela Heishman testified that, at the relevant times, she served as the grievance supervisor and litigation liaison at MCF. [DE 113 at 50–51]. She testified that MCF follows the grievance policy but admitted that if the process was not followed by staff, she may never know about it. [*Id.* at 51–52]. Nevertheless, Heishman confirmed the parameters of the policy as outlined above, including the special rules applicable to PREA grievances. [*See id.* at 68–69]. She also explained that staff are trained on the grievance policy and that notes to training instructors include the following paragraph instructing staff that inmate problems involving questions of civil rights cannot be resolved through the grievance process:

> Everyone has problems, no matter what setting they live in, and a correctional facility is no exception. Some problems revolve around serious violations of law. Other problems could involve questions of civil rights. These issues are most often settled in the courts. In a correctional facility there may be other problems or complaints that are either personal disagreements between an offender/youth and staff, or situations where a rule or regulation is violated that creates a hardship for a person or a group. Many times individuals see a way to improve a situation, but no one seems to listen. All of these types of situations are addressed in the Offender and Youth Grievance Processes.[3]

[*See id.* at 72–76].

Heishman further stated that grievances and appeals are only accepted on the approved forms. [*Id.* at 58]. She explained that inmates can only get grievance forms from facility staff, or possibly other offenders who have forms following interactions with staff, and that appeal forms are incorporated into the grievance response form generated on a case-by-case basis through the facility's Offender Grievance Review & Evaluation ("OGRE") system. [*Id.* at 59]. She testified that blank appeal forms are not available. [*Id.* at 62].

Having reviewed Bitzer's file, Heishman testified that he participated in the grievance portion of the admission/orientation process when he arrived at MCF. Referencing an OGRE report dated May 13, 2021[4] showing the history of Bitzer's grievances, which only listed two successful grievances—one in November 2018 regarding food and one in October 2020 regarding legal phone calls, Heishman testified that Bitzer never appealed any of his grievances and that there is no record of any

---

[3] Plaintiff's Exhibit 3, IDOC Offender and Youth Grievance Process Staff Training (PowerPoint and Instructor Notes), EX 00088.
[4] Defendant's Exhibit 2.

5

grievance from Bitzer related to the November 2019 sexual assault at issue in this case. [*Id.* at 56, 58]. The record does, however, include a copy of Bitzer's formal grievance dated May 5, 2020, concerning the prison staff's refusal to give him information on his PREA investigation. That grievance was returned to him on May 8, 2020, as untimely filed. [DE 26-4].

Defendants also called Michael D. Gapski to testify at the hearing. Gapski identified himself as the then-current grievance specialist at MCF but acknowledged that he was not the grievance specialist or otherwise involved with Bitzer's grievances in 2019–2020—the years relevant to this case. [DE 113 at 81:6–10; 97:19–98:6]. Based on his knowledge of the grievance policy, Gapski indicated that when offenders do not receive a response to a formal grievance, they must "move on to the next level [of the grievance process] as if it was denied." [*Id.* at 86:3–7]. He explained that appeal forms are available to offenders from him as the grievance specialist or from a counselor. [*Id.* at 87:15–20]. Gapski also testified that his access to MCF grievance records allowed him to review Bitzer's grievance history where he found accepted grievances, a return, but no grievance records regarding sexual assault or an attack by his dorm mates. [*Id.* 96:17–97:12].

Bitzer testified at the hearing as to his understanding of the grievance policy. He stated that the process starts with an informal grievance followed by a formal grievance and the possibility of appeals once a grievance is returned. He described the informal steps he took to resolve his concerns including talking to his dorm counselor before the sexual assaults began and asking to be moved due to the threats from his cellmate

6

followed by letters to the warden, deputy warden, internal affairs, mental health, and the unit team manager after the sexual assaults began. Getting no response from any of those communications, Bitzer sought guidance from his family and even contacted the State ombudsman about his issues[5] but still got no response from any prison official.

      Bitzer reports having discussed the lack of responses with his dorm officer and RWI counselor who advised him to file a formal grievance. Bitzer testified that he then filed his formal grievance at the end of November or in early December 2019—on the day after his rape kit. Bitzer secured a grievance form from his dorm representative, another inmate known as "Ghost," because the facility was on lockdown at the time preventing Bitzer from picking up a grievance form himself. Bitzer immediately completed the form in no more than 25 minutes adding an additional notebook page, about ¾ full, describing the threats, assaults, and rape as well as the lack of response from prison staff. At Ghost's direction, Bitzer sealed the grievance in a business envelope, wrote "grievance specialist" on it, and gave it Ghost to deliver for him. Bitzer watched Ghost leave the dorm and then waited at the door until his return 5–10 minutes later. Ghost told Bitzer he delivered the grievance to the counselor who said she would be turning it in to the grievance specialist when she went to lunch.

      Bitzer explained at the hearing that he could not take the grievance to the counselor himself because he could not leave the dorm due to the threats and assaults. Moreover, Bitzer wanted to get the grievance filed as soon as possible. A visit to the

---

[5] Plaintiff's Exhibit 12, EX001263.

7

counselor himself could not have happened for about five days due to the facility's normal procedures for scheduling inmate visits to the counselor.

Bitzer testified that he does not have a copy of his grievance but that he never received a response of any kind. He stated that he sent letters to the warden, assistant warden, and his counselor inquiring about the grievance within about two weeks of filing it. The counselor told him to be patient, but he never got any response to those letters either. Bitzer admits that he never appealed the grievance because he believed he could not based on a conversation with the counselor. Bitzer asserts that he asked the counselor for an appeal form but was told that no such appeal form exists. [DE 113 at 35:3–10]. According to Bitzer, the counselor further stated that he would have to wait for a response to his original grievance form, which would include the appeal form. At the hearing, Bitzer also presented a request for interview form he sent to the assistant warden on April 21, 2020, asking for an update on his PREA filing in November 2019—a request that was returned to him date stamped as received on April 28, 2020, but with no response[6].

Faced with ongoing safety concerns, Bitzer filed the instant lawsuit on April 29, 2020, continued to write letters at least into July 2020 seeking assistance[7], and had his family and friends advocate for him with prison and state offices, including the governor's office. Bitzer admits that none of these communications were on formal grievance forms and were not directed to the facility's grievance specialist.

---

[6] Plaintiff's Exhibit 15.
[7] *E.g.*, Plaintiff's Exhibit 13 (July 7, 2020, letter to Angela Heishman); Plaintiff's Exhibit 14 (July 10, 2020, letter to the assistant warden).

8

## II.   ANALYSIS

### A.   Rule 50 Motion for Judgment as a Matter of Law

Bitzer concluded the evidentiary hearing with an oral motion for judgment as a matter of law under Fed. R. Civ. P. 50. "Judgment as a matter of law is justified only if after a full hearing there is no 'legally sufficient evidentiary basis to find for the party on that issue.'" *Thomas v. Anderson*, 912 F.3d 971, 975 (7th Cir. 2018) (citing Fed. R. Civ. P. 50(a)(1); *Lopez v. City of Cgo.*, 464 F.3d 711, 718 (7th Cir. 2006), *abrogated on other grounds by Williams v. Dart*, 967 F.3d 625 (7th Cir. 2020)). "When ruling on a Rule 50 motion, a court must view the evidence presented . . . in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Lopez*, 464 F.3d at 718. Here, Defendants' presentation at the evidentiary hearing was not bereft of evidence. Therefore, the undersigned recommends that Bitzer's Rule 50 motion be denied.

### B.   Exhaustion of Administrative Remedies

Pursuant to 42 U.S.C. § 1997e(a), prisoners are required to exhaust available administrative remedies prior to filing lawsuits in federal court. The Seventh Circuit has taken a "strict compliance approach to exhaustion." *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). In other words, "a prisoner who does not properly take each step within the administrative process has failed to exhaust state remedies." *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002). "To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules

9

require." *Id.* at 1025. "Failure to exhaust is an affirmative defense that a defendant has the burden of proving." *King v. McCarty*, 781 F.3d 889, 893 (7th Cir. 2015).

Inmates are only required to exhaust administrative remedies that are available. *Woodford v. Ngo*, 548 U.S. 81, 102 (2006). The availability of a remedy is not a matter of what appears on paper but rather whether the process was in actuality available for the prisoner to pursue. *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). Thus, when prison staff hinder an inmate's ability to use the administrative process, such as by failing to provide him with the necessary forms, administrative remedies are not considered available. *Id.*; *see also Ross v. Blake*, 578 U.S. 632, 644 (2016) (finding a grievance process unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."). In essence, "[p]rison officials may not take unfair advantage of the exhaustion requirement . . . and a remedy becomes 'unavailable' if prison employees do not respond to a properly field grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting." *Dole*, 438 F.3d at 809.

Here, no one disputes that Bitzer had access to and was familiar with the applicable grievance policy. Moreover, the parties agree that Bitzer did not pursue every step of the grievance process before filing this lawsuit. Nevertheless, Bitzer argues that Defendants have not established their exhaustion affirmative defense for two reasons. First, Bitzer contends that he was not required to exhaust his administrative remedies in this case because MCF's grievance policy says that claims

10

like Bitzer's are non-grievable. Second, Bitzer asserts that the grievance process was not available to him in view of staff conduct.

### 1. Grievability

The IDOC grievance policy applicable in late 2019 when Bitzer endured threats, sexual assault, and rape lists "Tort Claims seeking monetary compensation" as non-grievable issues. [DE 26-2 at 4, § IV.B.12]. Yet the policy provides no definition of the term "Tort Claims," as confirmed by Heishman at the hearing. [*See id.* at 1–2, § III]. Bitzer argues that his Eighth Amendment, constitutional tort claims brought pursuant to 42 U.S.C. § 1983 fall into the policy's non-grievable "Tort Claims" category. *Cf. Manuel v. City of Joliet, Ill.*, 580 U.S. 357, 378 (2017) (Alito, J. and Thomas, J., dissenting) (referring to allegations of a probable cause violation of the Fourth Amendment, before the court pursuant to 42 U.S.C. § 1983, as a "constitutional tort").

Indeed, "there is no duty to exhaust if a remedy for an issue is not 'officially on the books'—that is, provided for in the text of the written grievance policy—in the first place. *Miles v. Anton*, 42 F.4th 777, 780 (7th Cir. 2022)[8]. The record as to whether Bitzer's Eighth Amendment constitutional tort claims fall into the policy's "Tort Claims" category is thin at best. In their previous summary judgment briefing, Defendants acknowledge the existence of the non-grievable, "Tort Claims" category in the policy but then state, without any supporting legal authority or factual development, that

---

[8] Bitzer cites nonbinding Sixth Circuit authority for essentially the same proposition. [*See* DE 117 at 9 (citing *Robinson v. Killips*, No. 2:17-CV-00098, 2020 WL 3441437, at *3 (W.D. Mich. May 26, 2020), *report and recommendation adopted*, No. 2:17-CV-98, 2020 WL 3429779 (W.D. Mich. June 23, 2020), which collected cases including *Figel v. Bouchard*, 89 F. App'x 970, 971 (6th Cir. 2004))].

11

Bitzer raises no state-law tort claims implying that only state-law tort claims are exempted from the grievance policy. [DE 41 at 3]. Beyond that, however, Defendants have not presented any evidence regarding the intended meaning of the phrase "Tort Claims," and whether the category was limited to state-law tort claims despite opportunities at the hearing and in their post-hearing brief.

Thus, Bitzer argues that Defendants' affirmative defense of exhaustion must fail because they have not shown that the grievance policy applied to Bitzer's claims. Essentially, Bitzer argues that Defendants have waived their exhaustion affirmative defense by failing to develop any evidence in support. *See United States v. Parkhurst*, 865 F.3d 509, 524 (7th Cir. 2017) (undeveloped arguments are waived). Yet Bitzer's interpretation of the "Tort Claims" category of non-grievable issues as inclusive of constitutional tort claims is not consistent with other legal authority regarding exhaustion of administrative remedies and the factual record here.

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies are exhausted." 42 U.S.C. § 1997e(a). Moreover, the Supreme Court has found "that the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). As excessive force claims typically sound in Eighth

12

Amendment law, *Porter* confirms that prisoners are statutorily required to exhaust administrative remedies before filing a lawsuit for constitutional tort claims.

Bitzer wants the Court to read the phrase "Tort Claims" broadly to encompass constitutional tort claims because the policy does not define "tort claims" specifically and MCF staff are taught that civil rights issues cannot be resolved through the grievance process. Both are problematic. First, Bitzer presents no authority to suggest that IDOC or MCF has the authority to override the PLRA's statutory mandate by defining constitutional torts as non-grievable. Second, Bitzer overstates the meaning of materials used by instructors when training prison staff regarding the process for solving problems in the correctional facility setting. As confirmed by Heishman at the hearing, training instructor materials explain that some problems in a correctional facility "involve questions of civil rights" and state that "[civil rights] issues are most often settled in the courts."[9] However, the fact that civil rights issues are often settled in the courts does not offer any insight into whether those same civil rights issues are grievable under the grievance policy.

Thus, a conclusive finding as to the meaning of the "Tort Claims" category of non-grievable issues here would require deeper factual development and legal analysis than the current record before the Court supports. Moreover, Defendants have not established that the grievance policy was available to Bitzer, as discussed below.

---

[9] Plaintiff's Exhibit 3.

13

### 2. Availability

Defendants argue that Bitzer failed to exhaust the administrative remedies available to him under the grievance policy and that his case should therefore be dismissed. In support, Defendants direct the Court's attention to Bitzer's history of grievances as maintained in the OGRE system, which shows no formal grievance being filed related to the subject matter of this litigation. Defendants also contend that the grievance allegedly submitted by Bitzer's dorm representative "Ghost" on his behalf did not comply with the policy, which prohibits offenders from "submit[ting] an offender grievance or appeal on behalf of another offender." [DE 26-2 at 7, § VIII.B]. Alternatively, Defendants argue that Bitzer failed to comply with the policy's procedures after he received no response to his grievance. Defendants focus on the policy's requirement that an inmate notify the grievance specialist within five days of submitting a grievance if he does not receive a receipt or a rejected form. [*Id.* at 9, § XI]. Notably, Gapski also confirmed in his testimony that the policy allows an inmate to appeal a grievance if he "receives no grievance response within 20 business days of being investigated by the facility offender grievance specialist." [DE 113 at 87: 3–11].

Defendants do not dispute that Bitzer sent many letters to assorted prison staff and others regarding his concerns. However, they note that Bitzer never notified the grievance specialist about the lack of response to his grievance and never filed an appeal despite provisions in the policy allowing for appeals when no response is given. As such, Defendants contend that Bitzer's failure to comply fully with all the provisions of the grievance policy establishes their affirmative defense of exhaustion of

14

administrative remedies. Defendants' arguments do not, however, take into account the entirety of the evidence in the record regarding Bitzer's grievance.

First, the record shows that Bitzer filed a formal grievance form in late November or early December regarding the events at issue in the case even though there is no reference to it in the OGRE system. Bitzer testified credibly—and with considerable detail—about how he secured the necessary form, completed it, and arranged for its delivery to the grievance specialist through his dorm representative, Ghost. Moreover, the topic of the grievance included the sexual assault that Bitzer endured at the hands of his cellmate. As such, the grievance would have been categorized as a PREA grievance—a point no one challenges here. Therefore, the modified requirements for a PREA grievance applied overcoming any concern about Ghost submitting Bitzer's grievance.[10]

Second, Bitzer has shown that he took intentional steps to ensure he complied with the policy. He contacted assorted prison officials in an attempt to address his grievance informally. When nothing happened, he sought advice from his dorm officer and RWI counselor who told him to file a formal grievance. When he got no response to his formal grievance, he asked his counselor for an appeal form only to be told that no such form exists aside from the appeal form attached to the grievance response and that he would have to wait for the response in order to appeal. Similarly, Heishman testified

---

[10] The record includes other evidence that PREA grievances were not properly handled by MCF. For instance, Bitzer's grievance dated May 5, 2020, explicitly uses the acronym PREA but denied as untimely. *See* Defendants' Exhibit 3, EX00008. Such an outcome is inexplicable given the lack of deadlines applicable to PREA grievances under the policy. [*See* DE 26-2 at 4–5].

that appeal forms are incorporated into the grievance response form generated by the OGRE system on a case-by-case basis and that blank appeal forms are not available.

Third, Bitzer diligently sent letters to multiple people trying to get the protection he sought for the dangerous situation he faced. He even took the unusual step of communicating his concerns to the State ombudsman. Those communications were not part of any process outlined in the grievance policy, but they show Bitzer's diligent efforts to secure a solution to his problem. Such diligence supports an inference that Bitzer would have taken any step necessary to exhaust his administrative remedies.

On this record, it is clear that Bitzer knew and attempted to exhaust his administrative remedies under the grievance policy. It also clear that Bitzer was thwarted from appealing his grievance regarding the November 2019 events by the counselor who told him his only option was to wait for a response form that never came. See *Ross*, 578 U.S. at 644. Therefore, the grievance process was rendered unavailable to Bitzer by the misrepresentation of prison staff. Accordingly, the affirmative defense of exhaustion of administrative remedies should be overruled.

### III. CONCLUSION

For the reasons discussed above, the undersigned:

(1) **FINDS** that the Miami Correctional Facility maintained a grievance system that allowed John Bitzer to submit a timely grievance regarding the threats, sexual assaults, and rape he faced between in or around November 2019;

(2) **FINDS** that John Bitzer submitted a formal grievance regarding the incidents in or around November 2019 but did not timely appeal the lack of response from designated prison officials;

(3) **FINDS** that the staff of Miami Correctional Facility rendered the grievance process unavailable to John Bitzer;

(4) **RECOMMENDS** that Bitzer's Rule 50 motion for judgment as a matter of law on exhaustion of administrative remedies be **DENIED**; and

(5) **RECOMMENDS** that Defendants' affirmative defense of failure to exhaust administrative remedies be **OVERRULED** and that discovery procced so that this case may be resolved on its merits.

> **NOTICE IS HEREBY GIVEN that within fourteen (14) days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and/or recommendations. Fed. R. Civ. P. 72(b). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.**
>
> **SO ORDERED** this 22nd day of February 2024.

s/Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge